1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   RYAN MURPHY, individually and on
     behalf of all others similarly situated,
12                                                No. 2:24-cv-00527-TLN-JDP
13                Plaintiff,

14        v.                                      **ORDER**

15   CONFIRM ID, INC.,
16                Defendant.
17

18
19        This matter is before the Court on Defendant Confirm ID, Inc.'s ("Defendant") Motion to

20   Compel Arbitration (ECF No. 14) and Motion to Dismiss (ECF No. 15).  Both motions are fully

21   briefed.[1]  (ECF Nos. 16, 17, 26, 28.)  For the reasons set forth below, Defendant's motion to

22   compel arbitration is GRANTED and Defendant's motion to dismiss is DENIED as moot.

23   ///
24   ///
25   ///
26   ///
27   _____

28   [1]    The Court is also in receipt of Plaintiff's Notices of Supplemental Authority.  (ECF Nos.
     32, 33, 34.)

                                              1

1    **I.    FACTUAL AND PROCEDURAL BACKGROUND**[2]

2    The instant action arises out of Defendant's alleged unlawful collection, obtainment, use,

3    store, and disclosure of biometric information in connection with an adult dating website called

4    Adult Friend Finder ("AFF").  (*See* ECF No. 1.)  Plaintiff Ryan Murphy ("Plaintiff") alleges he

5    opened an account on AFF within the five years immediately preceding the filing of this action

6    and Defendant processed his biometric information as part of the process of signing up for an

7    account.  (*Id.* at 2.)  Plaintiff alleges he was required to upload a picture of a valid state-issued

8    identification and a real-time portrait of his face (i.e., a "selfie") as part of the process of signing

9    up.  (*Id.*)  Utilizing Defendant's services, AFF then scans the "selfie" photograph, creates a

10   biometric template of the user's face, and compares the user's facial biometrics to the photograph

11   on the identification document to confirm whether they match.  (*Id.*)

12   AFF invites users to engage in verification (through Defendant's services) by awarding a

13   "500 point bonus" and a "special check mark icon" to those users who choose to engage in the

14   process, signaling to other users they are verified.  (*Id.*)  Plaintiff alleges Defendant, acting as a

15   processor for AFF, collects, stores, possesses, otherwise obtains, uses, and disseminates its users'

16   facial geometry scans, categorized as biometric data to, among other things, further enhance AFF

17   and its online "app-based" platform.  (*Id.*)  Plaintiff further alleges Defendant's unlawful

18   collection, obtainment, storage, and use of its users' biometric data exposes them to serious and

19   irreversible privacy risks.  (*Id.*)

20   On February 20, 2024, Plaintiff filed the instant action, alleging claims for violations of

21   Illinois' Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.*  (ECF No. 1.)  On

22   April 22, 2024, Defendant filed the instant motion to compel arbitration.  (ECF No. 14.)

23   **II.    STANDARD OF LAW**

24   In deciding whether to compel arbitration, a district court typically determines two

25   gateway issues: (1) whether a valid agreement to arbitrate exists; and, if it does, (2) whether the

26   agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363

27   _____

28   [2]    The following allegations are taking largely verbatim from Plaintiff's Complaint.  (ECF No. 1.)

2

1   F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of an arbitration agreement, federal

2   courts 'should apply ordinary state-law principles that govern the formation of contracts.'"  *Ingle*

3   *v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (citing *First Options of Chicago,*

4   *Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  If the court is "satisfied that the making of the

5   arbitration agreement or the failure to comply with the agreement is not in issue, the court shall

6   make an order directing the parties to proceed to arbitration in accordance with the terms of the

7   agreement." 9 U.S.C. § 4.  "[A]ny doubts concerning the scope of arbitrable issues should be

8   resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.* (*Moses*

9   *H. Cone*), 460 U.S. 1, 24–25 (1983).  If a court "determines that an arbitration clause is

10  enforceable, it has the discretion to either stay the case pending arbitration, or to dismiss the case

11  if all of the alleged claims are subject to arbitration."  *Hoekman v. Tamko Bldg. Prod., Inc.*, No.

12  2:14-cv-01581-TLN-KJN, 2015 WL 9591471, at *2 (E.D. Cal. Aug. 26, 2015) (citation omitted).

13         There is an "emphatic federal policy in favor of arbitral dispute resolution."  *Mitsubishi*

14  *Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 631 (1985).  As such, "'any doubts

15  concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the

16  problem at hand is the construction of the contract language itself or an allegation of waiver,

17  delay, or a like defense to arbitrability.'"  *Id.* at 626 (quoting *Moses H. Cone*, 460 U.S. 1 at 24–

18  25).  Therefore, an arbitration agreement may only "be invalidated by 'generally applicable

19  contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only

20  to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at

21  issue."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343–44 (2011) (quoting *Doctor's*

22  *Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).  Courts may not apply traditional

23  contractual defenses, like duress and unconscionability, in a broader or more stringent manner to

24  invalidate arbitration agreements and thereby undermine FAA's purpose to "ensur[e] that private

25  arbitration agreements are enforced according to their terms."  *Id.* at 1748 (quoting *Volt Info.*

26  *Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

27         With respect to arbitration agreements containing a delegation clause to delegate the

28  arbitrability question to an arbitrator, the Ninth Circuit has set forth the following guiding

3

1  principles.  *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022).  First, a

2  district court "must resolve any challenge that an agreement to arbitrate was never formed, even

3  in the presence of a delegation clause."  *Id.*  Second, a district court must "resolve any challenge

4  directed specifically to the enforceability of the delegation clause before compelling arbitration of

5  any remaining gateway issues of arbitrability."  *Id.*  If the district court finds the parties formed an

6  arbitration agreement containing an enforceable delegation clause, "all arguments going to the

7  scope or enforceability of the arbitration provision are for the arbitrator to decide in the first

8  instance."  *Id.*

9      **III.**   **ANALYSIS**

10      The parties disagree at the outset about whether AFF's Arbitration Agreement (the

11  "Agreement") is enforceable.  Defendant argues: (1) it is a party to the Agreement as an affiliated

12  entity; (2) the Agreement delegates all questions, including those on scope and validity of the

13  Agreement, to the arbitrator; and (3) the Agreement is valid and enforceable and encompasses

14  Plaintiff's claims.  (ECF No. 14 at 14–20.)  Plaintiff contends: (1) the Court decides whether an

15  arbitration agreement was formed, not the arbitrator; (2) Defendant is not a party to the

16  Agreement; and (3) the sign-up screen did not provide Plaintiff with conspicuous notice of the

17  terms of use ("TOU").  (ECF No. 16 at 11–25.)

18      Even if there is a delegation clause, the Court "must resolve any challenge that an

19  agreement to arbitrate was never formed" and then "resolve any challenge directed specifically to

20  the enforceability of the delegation clause before compelling arbitration of any remaining

21  gateway issues of arbitrability."  *Caremark, LLC*, 43 F.4th at 1030.  The Court will first evaluate

22  whether an agreement to arbitrate was formed.  Next, the Court will consider whether the

23  delegation clause is enforceable.

24          A.    Whether a Valid Agreement to Arbitrate Exists

25      The Court will first consider whether a valid agreement to arbitrate exists — namely,

26  whether Defendant is a party to the Agreement and whether Plaintiff can be bound by the

27  Agreement (whether the sign-up screen provided Plaintiff with conspicuous notice of the TOU).

28  ///

*i.*        *Whether Defendant is a Party to the Agreement*

Defendant argues it is a wholly owned subsidiary of Various, Inc. ("Various") and was so at the time Plaintiff agreed to the TOU and the Agreement.  (ECF No. 14 at 15.)  Defendant asserts it is an affiliate of Various because it is under Various's direct control.  (*Id.*)  Defendant notes that because the Agreement to which Plaintiff agreed compels arbitration "of any claim, dispute, or controversy . . . between [Plaintiff] and [Various] or any of [Various's] *affiliated entities*," it is also a party to the Agreement.[3]  (*Id.* (internal citation omitted) (emphasis in original).)

In opposition, Plaintiff maintains Defendant is not a party to the TOU.  (ECF No. 16 at 14.)  Plaintiff argues Defendant is not named anywhere in the TOU, Plaintiff could not have reasonably expected he would be forced to arbitrate a privacy claim under the BIPA with Defendant by creating an online dating account with AFF, and Defendant did not produce evidence it was a subsidiary of Various at the time Plaintiff created his account.  (*Id.* at 14–15 (citing *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717–18 (9th Cir. 2020).)  Plaintiff also argues that Defendant contends "the Court cannot look to the Privacy Policy to determine the intention of the parties as it relates to the TOU and arbitration provision contained therein."  (*Id.* at 15.)  Finally, Plaintiff contends the case Defendant cites, *Meeks v. Experian Information Services*, No. 21-17023, 2022 WL 17958634 (9th Cir. Dec. 27, 2022), is distinguishable.[4]  (*Id.* at 15–16.)

In reply, Defendant maintains "the uncontroverted evidence demonstrates [Defendant] was an affiliate of Various at the time [Plaintiff] created his AFF account and purchased Gold

---

[3]        Defendant also argues at this juncture that Plaintiff and Defendant agreed in the Agreement and TOU to resolve disputes through arbitration.  (ECF No. 14 at 15–16.)  However, because this argument speaks more to the issue of whether Plaintiff agreed to the Agreement and its TOU when he signed up for an account and overlaps with Plaintiff's arguments on validity and enforceability, the Court will address it later when discussing the validity and enforceability of the Agreement.

[4]        Plaintiff also argues Defendant could have enforced the arbitration provision through an alternative theory such as the third-party beneficiary rule or equitable estoppel, but Defendant has waived any such argument because it did not raise an alternative theory in its motion.  (*Id.* at 16.)  Defendant indeed makes a third-party beneficiary argument in its reply.  (ECF No. 26.)  However, because the Court finds Defendant is a party to the Agreement, the Court declines to consider these arguments.

1    membership." (ECF No. 26 at 11.) Defendant notes it was explicitly listed in the Privacy Policy,

2    which is expressly incorporated into the TOU. (*Id.*) Defendant contends Plaintiff's reliance on

3    *Revitch* to assert that an unnamed affiliate cannot invoke an arbitration agreement is wrong. (*Id.*

4    at 12.)

5           State contract law governs whether a valid agreement to arbitrate exists. *Revitch*, 977

6    F.3d at 716. "A contract must be so interpreted as to give effect to the mutual intention of the

7    parties as it existed at the time of contracting[.]" Cal. Civ. Code § 1636. The mutual intention of

8    the parties is determined "'from the written terms [of the contract] alone,' so long as the 'contract

9    language is clear and explicit and does not lead to absurd results.'" *Revitch*, 977 F.3d at 717

10   (quoting *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809 (2007)); Cal. Civ. Code §§

11   1638 ("The language of a contract is to govern its interpretation, if the language is clear and

12   explicit, and does not involve an absurdity."), 1639 ("When a contract is reduced to writing, the

13   intention of the parties is to be ascertained from the writing alone, if possible . . . .").

14          Here, the very top of the TOU document contains the following paragraph:

15                **ARBITRATION NOTICE**: YOU AGREE THAT DISPUTES
16           BETWEEN YOU AND US WILL BE RESOLVED BY BINDING,
             INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR
17           RIGHT TO PARTICIPATE IN A CLASS-ACTION LAWSUIT OR
             CLASS-WIDE    ARBITRATION.    FOR    FURTHER
18           INFORMATION, REFER TO SECTIONS 24 AND 25 OF THESE
             TERMS.

19   (ECF No. 14-1 at 20.) Further, section 24 of the TOU, termed "Arbitration of Disputes," states in

20   part as follows:

21                ANY CLAIM, DISPUTE, OR CONTROVERSY . . . BETWEEN
22           YOU  AND  US  OR  ANY  OF  OUR  **AFFILIATED
             ENTITIES** . . . ARISING FROM OR RELATING TO THE USE
23           OF OUR WEBSITE, YOUR ACCOUNT, THESE TERMS, THEIR
             INTERPRETATION, OR THE BREACH, TERMINATION OR
24           VALIDITY HEREOF . . . OR THE RELATIONSHIPS WHICH
             RESULT FROM THESE TERMS (INCLUDING, TO THE
25           FULLEST EXTENT PERMITTED BY APPLICABLE LAW,
             RELATIONSHIPS WITH THIRD PARTIES WHO ARE NOT
26           SIGNATORIES  TO  THIS  AGREEMENT),  SHALL  BE
             RESOLVED EXCLUSIVELY AND FINALLY BY BINDING
27           INDIVIDUAL ARBITRATION.

28

                                          6

1  (*Id.* at 24 (emphasis added).)  Because the TOU "constitute a binding agreement between

2  [Plaintiff] and [Various] (*id.* at 20), the first inquiry is whether Defendant qualifies as an

3  "affiliate" of Various such that it can be bound by the Agreement.  As "affiliate" or "affiliated

4  entities" is not defined elsewhere in the TOU, the Court must rely on the ordinary definition of

5  "affiliate."  *Revitch*, 977 F.3d at 717 (citing Cal. Civ. Code § 1644 ("The words of a contract are

6  to be understood in their ordinary and popular sense, rather than according to their strict legal

7  meaning . . . ."))·  The Ninth Circuit has stated that the ordinary definition of "affiliate" is "a

8  company effectively controlled by another or associated with others under common ownership or

9  control."  *Id.*  Because Defendant is a wholly owned subsidiary of Various, which means Various

10  effectively controls Defendant, Defendant and Various are affiliates.

11      The second inquiry is whether the contract language "does not lead to absurd results."  *Id.*

12  In support of their arguments, the parties cite to *Revitch* and *Meeks*.  (ECF No. 14 at 14–15; ECF

13  No. 16 at 14–16.)  In *Revitch*, Revitch sued DIRECTV for conducting unsolicited telemarketing

14  campaigns and DIRECTV "somehow uncovered the fact" that Revitch was also a customer of

15  AT&T Mobility LLC.  977 F.3d at 715.  DIRECTV contended it was an "affiliate" of AT&T

16  within the meaning of Revitch's wireless services agreement and attempted to compel arbitration.

17  *Id.* at 717.  The Ninth Circuit concluded that "absurd results" followed from DIRECTV's

18  interpretation that it was an affiliate of AT&T, as Revitch would have been "forced to arbitrate

19  any dispute with any corporate entity that happen[ed] to be acquired by AT&T, Inc., even if

20  neither the entity nor the dispute has anything to do with providing wireless services to Revitch

21  — and even if the entity becomes an affiliate years or even decades in the future."  *Id.* at 717.

22  The Ninth Circuit concluded that when Revitch signed his agreement with AT&T to obtain cell

23  phone services, "he could not reasonably have expected that he would be forced to arbitrate an

24  unrelated dispute with DIRECTV, a satellite television provider that would not become affiliated

25  with AT&T until years later."  *Id.* at 718.  In *Meeks*, the Ninth Circuit concluded Experian was a

26  party to the arbitration agreement Meeks and others similarly situated entered into when they

27  signed up for credit-monitoring services provided by Experian's sister company, Experian

28  Consumer Services ("ECS").  2022 WL 17958634, at *1.  The court noted that "[t]he text of the

1    arbitration provision binds plaintiffs to arbitrate with ECS and defines ECS to include 'affiliate,'

2    and Experian is an affiliate and was so when the plaintiffs entered into the agreement." *Id.*  The

3    court distinguished *Revitch* by noting the fact that Experian "was an affiliate *at the time the*

4    *contract was formed* and that *it plays a role in the larger agreement* provide additional evidence

5    that it assented to be bound and was not a mere third-party beneficiary." *Id.* (emphasis added).

6         The Court acknowledges that Defendant was a subsidiary of Various at the time Plaintiff

7    created his account with AFF on July 6, 2023 — the time the contract was formed.[5]  Defendant

8    submits the declaration of David Bloom, the General Counsel of Various, who avers that Various

9    is a wholly owned subsidiary and affiliate of FriendFinder Networks Inc. and Defendant is a

10   wholly owned subsidiary and affiliate of Various.  (ECF No. 14-1 at 2.)  However, the Court

11   disagrees with Plaintiff that he "could not have reasonably expected that he would be forced to

12   arbitrate a privacy claim under the BIPA with [Defendant] by creating an online account with

13   AFF." (ECF No. 16 at 15.)  Plaintiff indeed repeatedly alleges in his Complaint that Defendant

14   performs services for AFF.  (*See* ECF No. 1.)  In particular, Plaintiff alleges the following:

15   • Defendant "operates as a third-party information 'processor' for [AFF]" (ECF No. 1 at ¶

16        1);

17   • "[AFF] is the controller and [Defendant] is the processor" (*id.* ¶ 1);

18   • Plaintiff "had his biometric information processed by [Defendant] as part of the process of

19        signing up for the account" (*id.* ¶ 2);

20   • "[AFF] utilizes the services of [Defendant]" (*id.* ¶ 4);

21   _____

     [5]      Plaintiff contends Defendant did not provide evidence that it was a subsidiary of Various

22   at the time he opened his account on AFF and is therefore distinguishable from *Meeks*.  (ECF No.
     16 at 15–16.)  The Ninth Circuit in *Meeks* simply concluded there was "sufficient evidence that

23   Experian sought to be bound by the arbitration provision" — namely, that "[t]he text of the
     arbitration provision binds plaintiffs to arbitrate with ECS and defines ECS to include 'affiliates,'

24   and Experian is an affiliate and was so when the plaintiffs entered into the agreement."  2022 WL
     17958634, at *2.  The court also notes "[t]hat Experian was an affiliate at the time the contract

25   was formed and that it plays a role in the larger agreement provide additional evidence that it
     assented to be bound and was not a mere third-party beneficiary." *Id.*  Therefore, Plaintiff's

26   assertion that "Experian had produced sufficient evidence that it was an intended party to the
     arbitration provision" is misleading.  (ECF No. 16 at 16.)  Further, Plaintiff does not cite to any

27   case law that requires Defendant to provide evidence that it was an affiliate of Various at the time
     Plaintiff opened his account on AFF.

28

- "[AFF] invites users to engage in verification via [Defendant] by awarding a '500 point bonus' and a 'special check mark icon' to those users who choose to engage in the process . . . ." (*id.* ¶ 5);

- "[Defendant], acting as processor for [AFF], collects, stores, possess, otherwise obtains, uses, and disseminates its users' facial geometry scans, categorized as biometric data to, among other things, further enhance [AFF] and its online 'app-based' platform" (*id.* ¶ 6);

- "[Defendant], as a processor for [AFF], then scanned Plaintiff's 'selfie' photograph, creating a biometric template of Plaintiff's faces and biometric identifiers, and compared Plaintiff's biometric identifiers to the photograph on his state issued identification document to confirm whether they match" (*id.* ¶ 23);

- "[Defendant], as a processor for [AFF], collected and retained biometric information for the purpose of verifying Plaintiff's identity prior to opening an [AFF] account in Plaintiff's name" (*id.* ¶ 25); and

- "Ostensibly, the purpose of [Defendant's] collection of Plaintiff's facial geometry was to verify Plaintiff's identity prior to opening an [AFF] account in Plaintiff's name" (*id.* ¶ 27).

Based on the foregoing allegations, the Court finds the situation presented in the instant matter is therefore unlike the situation in *Revitch*.  In *Revitch*, DIRECTV, "who provide[d] services unrelated to cell phone coverage" attempted to enforce an arbitration provision in a wireless services agreement between Revitch and AT&T.  977 F.3d at 717.  Unlike *Revitch*, Plaintiff implicitly acknowledges that Defendant is an affiliate of Various throughout the Complaint and provides services for Various through AFF.  Therefore, Plaintiff could "reasonably have expected that he would be forced to arbitrate" the dispute with Defendant.  977 F.3d at 717–18.  Further, the fact that Defendant "plays a role in the larger agreement" with Various and AFF provides additional evidence that it assented to be bound.  *Meeks*, 2022 WL 17958634, at *2.

Finally, the Court recognizes the canon of California contract interpretation that "[t]he whole of a contract is to be taken together, so as to give effect to every part."  *Id.* (citing Cal. Civ. Code § 1641; *Coral Farms, L.P. v. Mahony*, 63 Cal. App. 5th 719, 727 (2021)).  The Privacy Policy is a part of the TOU through express incorporation.  (ECF No. 14-1 at 20 (The TOU notes

that "[a]ny personal information submitted through the Website by you is subject to our Privacy

Policy, which is incorporated herein by reference.").)  In reading through the Privacy Policy (the

contract as a whole), the Court finds persuasive Defendant's argument that it was explicitly listed

as a subsidiary.  Namely, the Privacy Policy states that it applies to "FriendFinder Networks, Inc.

and its subsidiaries," and Defendant is clearly listed under the "Subsidiaries" section.  (ECF No.

14-1 at 28, 31.)

Based on the foregoing, the Court finds that Defendant is a party to the TOU and, by

extension, the Agreement.

*ii.     Whether Plaintiff Can Be Bound By the Agreement*

Defendant argues that Plaintiff "unequivocally agreed to the TOU and AFF Arbitration

Agreement by clicking his consent to the registration affirming that he read and agreed to them

prior to allegedly using [Defendant] to verify his identity." (ECF No. 14 at 16.)  Defendant

maintains that courts have routinely found clickwrap agreements valid and enforceable "because

the user must affirmatively acknowledge receipt of the terms of the contract." (*Id.* (citing cases).)

In opposition, Plaintiff asserts that the sign-up screens for an AFF account and the AFF

Gold membership are exactly the type the Ninth Circuit found to be unenforceable "as they do not

give reasonably conspicuous notice of the TOU." (ECF No. 16 at 19–20 (citing *Berman v.

Freedom Financial Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022).)

The Ninth Circuit has indeed set forth rules to determine whether "meaningful assent" has

been given to an online agreement.  *Berman*, 30 F.4th at 856.  The court has explained:

> Unless the website operator can show that a consumer has actual
> knowledge of the agreement, an enforceable contract will be found
> based on an inquiry notice theory only if: (1) the website provides
> reasonably conspicuous notice of the terms to which the consumer
> will be bound; and (2) the consumer takes some action, such as
> clicking a button or checking a box, that unambiguously manifests
> his or her assent to those terms.

*Id.*  "Reasonably conspicuous notice" requires that (1) a notice must be displayed in a font size

and format such that the court can fairly assume that a reasonably prudent Internet user would

have seen it" and (2) "while it is permissible to disclose terms and conditions through a hyperlink,

the fact that a hyperlink is present must be readily apparent." *Id.* at 856–57.  The court clarified

that "[s]imply underscoring words or phrases . . . will often be insufficient to alert a reasonably

prudent user that a clickable link exists." *Id.* at 857.  Another district court succinctly

summarized the issues in *Berman*:

> In *Berman*, [p]laintiffs were prompted to access a website by a large green "Continue" button.  Below that button, in two lines of gray text against a white background, which were considerably smaller than any other text on the page, the page read "I understand and agree to the Terms & Conditions . . . " 30 F.4th at 854.  The text was "sandwiched" between large, attention-grabbing buttons prompting the user to take actions. *Id.*  The Court held the agreement unenforceable because the terms themselves were not reasonably conspicuous and the existence of a hyperlink was not readily apparent. *Id.* at 856–57.  Thus, the agreement was unenforceable for want of "any action that unambiguously manifested [plaintiffs'] assent to be bound by the terms and conditions. *Id.*

*Lincoln v. MX Techs., Inc.*, No. 2:23-CV-00806-MCE-CSK, 2024 WL 3274831, at *2 (E.D. Cal.

July 2, 2024).

    Here, Plaintiff makes several analogies to *Berman* but the Court finds the two matters are

factually dissimilar.  With respect to the sign-up screen to create an AFF account, the Court

indeed finds Plaintiff's argument persuasive that "the textual notice is printed in a gray font

considerably smaller than the font used in the other sections of the sign-up screen," and the

"'comparatively larger [and bolded] font used in all of the surrounding text' and large blue shaded

box with large white text 'naturally directs the user's attention' from the textual notice."  (ECF

No. 16 at 19 (citing *Berman*, 30 F.4th at 857).)  However, from what the Court can ascertain from

Plaintiff's screenshot of the sign-up screen (ECF No. 16 at 8), unlike *Berman*, the text has not

been placed in between larger, attention-grabbing buttons that prompt the user to take action.  30

F.4th at 854.

    Further, in *Berman,* only two lines of gray text against a white background were used with

no different color to offset the links to the terms and conditions.  30 F.4th at 354.  Here, the two

links on the AFF sign-up page are contrasted in blue text, while the remainder of the sentence is

in gray text.  Defendant correctly notes that courts have held the exact color scheme provides

reasonably conspicuous notice.  (ECF No. 26 at 7–8 (citing *Houtchens v. Google LLC*, 649 F.

Supp. 3d 933, 937 (N.D. Cal. 2023) (website provided conspicuous notice of terms where, as

11

here, links were in blue text next to gray text); *Berman*, 30 F.4th at 854 (blue is "the color

typically used to signify the presence of a hyperlink"); *Williams v. DDR Media, LLC*, No. 22-CV-

03789, 2023 WL 2314868, at *5 (N.D. Cal. Feb. 28, 2023) (links are "traditional[ly] blue,"

making them "distinguishable from the surrounding text" to "a reasonably prudent user")).)

Finally, the links on the sign-up page are non-italicized while the remainder of the

sentence is italicized. Defendant's Exhibits A and B[6] to its reply brief contains YouTube videos

that are recordings of the screen an individual would see when becoming an AFF member and the

TOU and Privacy Policy that appears when an individual clicks on the blue hyperlinked text.

(ECF No. 26-2 at 2.) The Court finds the links are dynamic and display an underline when the

user touches them. Defendant also correctly notes courts have held this was sufficient to put a

user on notice of a link — even without different colored text — and that placing the links

immediately below the button the user must click to complete the sign-up process is the

appropriate place to locate links to website terms. (*Id.* (citing *Lincoln*, 2024 WL 3274831, at *2;

*Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023); *Hooper v. Jerry Ins.*

---

[6]    Plaintiff objects to the inclusion of the YouTube videos because they were raised for the
first time in a reply brief. (ECF No. 30 at 3.) Plaintiff also contends the videos are inadmissible
because they lack foundation and are hearsay. (*Id.* at 4–5.) In response, Defendant contends
Plaintiff first raised the arguments that the links to the TOU and Privacy Policy were illegible or
dysfunctional in his opposition, and in rebuttal Defendant submitted evidence demonstrating how
the links appear when navigating the AFF website on a mobile device. (ECF No. 31 at 3.)
Defendant further contends the declarants did not lack foundation to verify the accuracy of the
videos, and the videos and screenshots are not hearsay because they visually demonstrate facts.
(*Id.* at 3–6.) First, the Court agrees with Defendant that a movant can present "rebuttal evidence
to contravene arguments first raised by the non-moving party in its opposition." *Cal. Open Lands
v. Butte Cnty. Dep't of Public Works*, No. 2:20-cv-00123-DJC-DMC, 2024 WL 1660337, at *5
n.6 (E.D. Cal. Apr. 17, 2024). Second, because "[e]vidence to prove personal knowledge may
consist of the witness's own testimony," *see* Fed. R. Evid. 602, the Court finds the Arohnson and
Bloom declarations lay a sufficient factual foundation that explains how Arohnson personally
observed the creation of each video on a colleague's mobile device with the same displays
Plaintiff would have seen and how Bloom has knowledge about how a prospective user navigates
the webpages and that the process and display have not changed since July 2023 when Plaintiff
navigated the pages. Finally, Plaintiff fails to explain what out-of-court statements Defendant is
attempting to offer in evidence through these videos, given that the videos are demonstrative
exhibits—not statements—that are used to demonstrate facts. *See Bean v. Costco Wholesale
Corp.*, 561 F. Supp. 3d 915, 920 (E.D. Cal. 2021) (finding a surveillance video without sound and
conveys only conduct is not "communicative" as a statement and not hearsay). Accordingly,
Plaintiff's objection is OVERRULED.

1    *Agency, LLC*, 675 F. Supp. 3d 1027, 1032, 1035 (N.D. Cal. 2023)).)  In contrast, the court in

2    *Berman* found that the existence of the hyperlink was not readily apparent.  30 F.4th at 856–57.

3          Based on the foregoing, the Court finds that the TOU and Privacy Policy on the sign-up

4    screen for the AFF membership provides "reasonably conspicuous notice" because the notice is in

5    such a font size and format that "a reasonably prudent Internet user would have seen it" and the

6    hyperlinks are readily apparent.  *Berman*, 30 F.4th at 856–57.  Finally, the parties do not dispute

7    that Plaintiff clicked the button to "unambiguously manifest[]" his assent to those terms.  (ECF

8    Nos. 14, 16, 26.)  Accordingly, the Court finds that Plaintiff was on notice of the TOU and

9    Privacy Policy on AFF's website and can be bound by the Agreement.[7]

10                  B.      Delegation Clause[8]

11          As previously stated, the Court typically must decide two gateway issues on a motion to

12    compel arbitration: (1) whether there is an agreement to arbitrate between the parties; and (2)

13    whether the agreement covers the dispute.  *Lifescan, Inc.*, 363 F.3d at 1012.  However,

14    determination of these gateway issues "can be expressly delegated to the arbitrator where the

---

15
16    [7]     With respect to the sign-up screen for the Gold membership, Plaintiff contends it suffers
      from the same flaws as the sign-up screen.  (ECF No. 16 at 20.)  The only argument Defendant
17    makes in defense of this screen is that the links are located immediately below the button a user
      must click to complete the Gold membership process.  (ECF No. 26 at 8.)  The Court has
18    reviewed Plaintiff's screenshot of the Gold membership sign-up screen (ECF No. 16 at 9) as well
      as Defendant's YouTube video links of the sign-up pages (ECF No. 26-2 at 2–3).  Because these
19    links are not offset by a different color or italicized/non-italicized in comparison to the rest of the
      text, the links do not provide reasonably conspicuous notice.  However, in light of the foregoing
20    analysis on the AFF sign-up screen, this does not change the Court's conclusion on whether
      Plaintiff is bound by the TOU and Privacy Policy.  The hyperlinks take the user to the exact same
21    documents on the AFF sign-up page and the Gold membership page.

22    [8]     Plaintiff also makes several arguments about how the Agreement is procedurally
23    unconscionable.  (ECF No. 16 at 21–24.)  However, none of Plaintiff's unconscionability
      arguments refer to, single out, or even mention the delegation provision.  To the contrary,
24    Plaintiff appears to challenge the TOU as a whole, with a special emphasis on several provisions
      *other than* the delegation provision.  The Court therefore declines to consider Plaintiff's broad
25    unconscionability arguments.  *Mohamed*, 848 F.3d at 1210 ("When considering an
      unconscionability challenge to a delegation provision, the court must consider only arguments
26    specific to the delegation provision." (citation and internal quotation marks omitted)); *see also*
27    *Willis v. Fitbit, Inc.*, No. 19-CV-01377-DMS-WVG, 2020 WL 417943, at *4 (S.D. Cal. Jan. 27,
      2020).  Accordingly, the merits of Plaintiff's unconscionability arguments must be decided by the
28    arbitrator.

1   parties clearly and unmistakably provide otherwise." *Brennan v. Opus Bank*, 796 F.3d 1125,

2   1130 (9th Cir. 2015).  For example, the Supreme Court has "recognized that parties can agree to

3   arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate

4   or whether their agreement covers a particular controversy." *Rent-A-Ctr. West, Inc. v. Jackson*,

5   561 U.S. 63, 68 – 69 (2010); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S.

6   63, 68 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a

7   court may not override that contract."); *Mohamed v. Uber Techs.*, 848 F.3d 1201, 1208 (9th Cir.

8   2016) ("[L]anguage delegating to the arbitrators the authority to determine the validity or

9   application of any of the provisions of the arbitration clause[ ] constitutes an agreement to

10  arbitrate threshold issues concerning the arbitration agreement.").  Put simply, parties can include

11  a delegation provision in an arbitration agreement that requires an arbitrator to decide gateway

12  issues rather than the Court.

13       Defendant argues the Agreement "contains an express delegation clause that manifests

14  'clea[r] and unmistakabl[e]' evidence of the parties' agreement to delegate the gateway question

15  of arbitrability to the arbitrator."  (ECF No. 14 at 17 (citing *First Options of Chicago, Inc. v.

16  Kaplan*, 514 U.S. 938, 944 (1995)).)  Defendant further argues the Agreement incorporates the

17  JAMS Streamlined Rules, "which independently 'constitutes clear and unmistakable evidence

18  that contracting parties agreed to arbitrate arbitrability.'"  (*Id.* (citing *Flores v. Coinbase, Inc.*, No.

19  CV 22-8274-MWF (KS), 2023 WL 3564756, at *5; *Harry Schein*, 586 U.S. at 66).)

20       In opposition, Plaintiff maintains "it is well-settled in the Ninth Circuit that district courts

21  are tasked with the responsibility of determining whether an agreement to arbitrate exists in the

22  first instance, even in the presence of a delegation clause."  (ECF No. 16 at 11 (citing cases).)

23  Plaintiff contends that when a party opposing arbitration "claims to have never agreed to" the

24  contract requiring arbitration, the district court must first address the threshold issue of the

25  existence of an arbitration agreement.  (*Id.*)  Plaintiff also argues that even if an arbitration

26  agreement exists, a delegation clause is enforceable only if the parties "clearly and unmistakably"

27  agreed to delegate arbitrability to the arbitrator, and here the arbitration provision specifically

28  allows courts to determine enforceability of the arbitration agreement and the TOU allow for

14

1   exclusion of terms a court may deem unenforceable.  (*Id.* at 12–13.)  Plaintiff asserts that an

2   agreement's incorporation of JAMS or AAA rules, in addition to a provision allowing a court to

3   hold provisions unenforceable, creates uncertainty and precludes a funding of "clear and

4   unmistakable delegation to the arbitrator."  (*Id.* at 13.)

5        Here, the Agreement contains a delegation clause that delegates the question of

6   arbitrability to the arbitrator.  The Agreement states, in relevant part:

7           ANY CLAIM, DISPUTE, OR CONTROVERSY . . . ARISING
        FROM OR RELATING TO YOUR USE OF THE WEBSITE,

8           YOUR ACCOUNT, THESE TERMS, THEIR INTERPRETATION,
        OR THE BREACH, TERMINATION OR VALIDITY HEREOF

9           (*INCLUDING THE SCOPE AND VALIDITY OF THIS
        ARBITRATION AGREEMENT*), OR THE RELATIONSHIPS

10          WHICH RESULT FROM THESE TERMS . . . *SHALL BE
        RESOLVED EXCLUSIVELY AND FINALLY BY BINDING*

11          *INDIVIDUAL ARBITRATION*.

12  (ECF No. 14-1 at 24 (emphasis added).)  The Supreme Court, Ninth Circuit, and district courts

13  have found that a delegation clause constitutes clear and unmistakable evidence of an intent to

14  delegate.  *Henry Schein*, 586 U.S. at 66; *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)

15  (finding the language "the validity or application of any of the provisions of" the arbitration

16  clause constitutes "an agreement to arbitrate threshold issues concerning the arbitration

17  agreement" (quoting *Rent-A-Ctr.*, 561 U.S. at 68)); *Flores*, 2023 WL 3564756, at *4; *Fridman v.

18  Uber Techs., Inc.*, No. 18-CV-02815-HSG, 2019 WL 1385887, at *5 (N.D. Cal. Mar. 27, 2019).

19       In sum, the delegation provision clearly and unmistakably provides that the enforceability

20  of the arbitration agreement is a question for the arbitrator, not the Court.  Accordingly, the Court

21  GRANTS Defendant's motion to compel to allow the arbitrator to decide these gateway issues,

22  and, if permissible, to arbitrate the substantive claims.

23      **IV.**   **CONCLUSION**

24       For the foregoing reasons, Defendant's motion to compel and stay the case pending

25  arbitration is GRANTED.  (ECF No. 14.)  Defendant's motion to dismiss is DENIED as moot.

26  (ECF No. 15.)  The Court STAYS the litigation to permit an arbitrator to decide the gateway

27  issues and then, if permissible, to arbitrate the substantive claims.  If it is determined by the

28  arbitrator that certain claims are not subject to arbitration, Plaintiff may file a request to lift the

1    stay, and the Court will do so immediately.  Within fourteen (14) days of the completion of

2    arbitration proceedings, the parties shall file a joint status report advising the Court of the

3    outcome of the arbitration and a request to dismiss the case or vacate the stay.

4         IT IS SO ORDERED.

5    Date:  February 24, 2025

6

7

8

9
_____
10   TROY L. NUNLEY
     CHIEF UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28